Good morning, Your Honors. I'm Jeffrey Baird, representing Vernon Barr. May it please the Court, this is a Social Security disability case. It has a mental component and a physical component. I'd like to go through each of those, and I'd like to reserve just about two minutes for rebuttal. The mental evidence shows worsening, and that comes in 2010 and 2011. The key doctors are Dr. Trowbridge and, at VHR, Dr. Sampson. Dr. Sampson sees the claimant once every six weeks for roughly a year, and Dr. Trowbridge does two evaluations with examination and testing, one in April 2010 and one in April 2011. He finds severe anxiety and severe depression, imposing marked and even severe limitations on the ability to tolerate the stresses of a work environment and the ability to work around supervisors and co-workers. The evidence the government relies on is earlier. It's from 2009, and who gives a somewhat tentative report. She's puzzled as to what's going on. She doesn't give any limitations. She doesn't give a GAF rating, and she questions if he was malingering, but she thinks he might have a personality disorder, what she calls a disorder of self. The better evidence, the more definitive evidence, for the mental impairment comes later, 2010, 2011, especially the VHR records, which were reviewed by Dr. Trowbridge, who does set specific limitations that seem to be associated with the anxiety, especially, as well as the panic attacks. The claimant's consistently on Klonopin, which is a strong anti-anxiety medication, as well as antidepressants. Dr. Sampson experiments some with how much to give of each drug, how many times there's improvement, but overall, it's not uniformly effective. The reports from Dr. Sampson at VHR in 2011 are, it's not entirely effective. I think the mental impairment under Social Security ruling 85-15, which would say the ability to tolerate stresses at least in routine environments, the ability to get along with co-workers and supervisors, at least emoticum, would suggest he can't sustain work after 2010 and into 2011. There's a curious physical problem also, and I was wondering if that was why I was invited to oral argument. The ALJ had a physically very generous, and I think correct, RFC assessment by and large, for less than sedentary work. Sedentary with many other additional restrictions, but no manual restrictions. Unskilled sedentary work is characterized by the need to have good bimanual dexterity with the hands. There's really no hand impairment clear in the record until the hearing itself. At the hearing itself, the plaintiff shows his hands and says, I have these fissures on my hands and soles of my feet. He says, it itches, it bleeds, his significant other testifies and says, it wakes us up with itching. Was that the first time the eczema was raised? I think it was just at the hearing. That seems peculiar. Well, unless that was when it was coming on. It's neoplastic growth, according to the doctors. I'm just saying, normally, it seems like that's one of your basis for finding that there was a nerve below, that the ALJ did not find that to be a severe condition. Am I understanding your brief correctly? That's correct. And so there was no medical, I mean, throughout the pending of, once the case was filed up until the hearing, there wasn't any medical support or documentation for that. Then at the, I think it was at the hearing, it raises this, I think, for the first time and then just sort of gives some reports. Is that correct? Right. He gave his testimony. He showed his hands to the inquisitorial ALJ and his witness also testified to the presence of the fissures in the hands. And I thought that's the primary point in your briefing. I didn't realize it was primarily the mental, which is what you started with here today. It's both. They're both in there. Yes. It seems, would you agree that the thrust of your briefing was on the physical? Well, it was really Dr. Trowbridge was not rejected for sufficient reasons. Okay. I guess, so let me, since on this skin issue, the eczema, I'm just trying to figure out where do the dermatologist examinations that your client submitted to the appeals council show that the eczema was not treatable or as it has been in the past or that it affects his ability to work? I just didn't see that. Right. They don't give any limitations. They said there's neoplastic growth, which are tumors and they send them out for biopsies to see if there's something deeper going on. So why would the appeals council have sent that or remanded that to the ALJ if there was no issues showing that it wasn't severe? Well it's a medically determinable impairment because the dermatologists have found it, deep painful fissures, and they're getting worse by September and they're sending them out for a biopsy to explore the neoplasms. So they didn't have it in their, they weren't asked to list limitations, but it raises the question, is this going to be an enduring impairment and would it affect handling? And if it affects handling, it could knock out the sedentary work world. That's what's going on with that. So if you're saying we don't know it's going to last 12 months, on the record we have, we don't. We don't know for sure, but it is worsening and it would affect the hands and if the hands go, even to a less than frequent use, that would knock out the sedentary unskilled work or at least require additional VE testimony to explore that. So the question that is raised is, well, we don't know if it's severe or not because it's getting worse, it's come up late, but it's within the period at issue. And the question is, will it be likely to last 12 months and if so, would it prevent handling? So that's the puzzle. Okay. Anything else? No, I can reserve my time. Thank you. If it may please the Court, Kathy Rafe for the Commissioner. At issue here is the fact that Mr. Barr had the burden of proof in terms of proving his disability. He had the burden to provide evidence that he had impairments that were medically determinable and he had the burden to produce evidence that those impairments caused limitations that precluded him from performing substantial gainful activity for 12 continuous months. He did not meet those burdens here. The record before the ALJ makes no mention of a skin condition. He doesn't list it on his application as an impairment. He doesn't allude to any limitations in using his hands or feet in terms of his walking or standing. The function reports filled out by his significant other, Ms. Sievert, deny the existence of problems using his hands and or walking or to do dishes. He's able to drive. He plays video games frequently enough that it interferes with his responsibilities, according to Ms. Sievert. He attends casinos multiple times a month. At a psych examination in 2009, he was noted to use silly play throughout the examination to keep his hands busy. At the hearing, Mr. Barr presented unreliable subjective statements that he had a recurring condition of eczema and that he could barely close his hands. His testimony was not sufficiently specific to establish that it was currently limiting his ability to close his hands. The ALJ informed Mr. Barr at the hearing that he was not a medical, he was not capable of putting him on notice that the record was insufficient as to this particular impairment. So he later supplied this dermatology report right to the appeals council? He provided two treatment notes. The first visit was, I believe, six or seven weeks after the ALJ's decision. It shows that this was the first time he had sought out treatment for it, undermining his claims that it was severe or causing limitations in any way. And some of the terminology they used to describe it was mild or moderate when discussing the actual impairment. And then there was a follow-up treatment note about mid-September 2011. Neither of those provide any evidence of limitations either before the ALJ's decision or afterwards. So the issue is whether or not those two treatment notes undermine the substantial evidence supporting the ALJ's decision, and they don't. Let's talk about the ALJ's treatment of Dr. Trowbridge. So the ALJ gave some weight to Dr. Trowbridge's checkbox opinions. He noted that Dr. Trowbridge in 2011 assessed mild to moderate cognitive impairments, and actually those impairments are accommodated by the RFC in this case. He limited Mr. Barr to one to two subtasks with jobs limited to SVP one to two. He limited him to stable work environments. Additionally, he also noted that there was a 2011 checkbox opinion given by Dr. Trowbridge. He found that the ALJ found, however, though, that the marked limitations in social functioning were belied by Mr. Barr's daily activities. Significantly in this case, the ALJ did accept that Mr. Barr had some social limitations. He found that he was limited to jobs that did not require dealing with the public as an essential part of the workforce. However, he found he was not precluded from incidental contact with the public. And that's consistent with Mr. Barr's daily activities, which show he maintained incidental contact with the public. He was able to go outside daily. He attended group meetings up to four times a week. He was able to go grocery shopping on a weekly basis. He was characterized as the one to take his significant other's grandson to his soccer games and practices. Therefore, the ALJ reasonably and appropriately found that an assessment of marked social limitations was belied by his activities. What about the knee pain? It looks like from the testimony of Mr. Barr, he suffered from chronic pain as a result of the knee surgery and could not bear much weight on it. And that's consistent, it seems like, with the medical evidence of his complaints of knee pain and using a walking aid. So what's your response to that? Well, first, the ALJ noted significant inconsistencies in Mr. Barr's statement of limitations when it came to his knee impairment. He noted that he testified to having pain when he stood on it and bore any weight on it whatsoever. However, in other places, the medical records showed that the grinding he was talking about was not appreciated by the ALJ. His medical professionals, they noted, the ALJ noted at other times when he reported to his medical professionals that his pain was overall well controlled following the knee surgery and that he was fully weight-bearing on it within six weeks of that surgery. Moreover, the ALJ accommodated a limitation with standing and walking by limiting him to sedentary work, which requires no more than two hours of standing and walking in a day. Sedentary jobs are primarily performed in a seated position. I don't know if that addresses your question, Your Honor. Thank you. Overall, Mr. Barr did not meet his burden of proof. He did not meet the burden to show that his mental impairments were not accommodated by the residual functional capacity. An incredibly important part of this case is Mr. Barr's credibility. The ALJ spent significant time and energy talking about why Mr. Barr was not credible. He first noted the affirmative evidence of lingering in the record based on Dr. Van Dam's assessment that his symptom validity testing was consistent with individuals who were found malingering. Moreover, the ALJ gave clear and convincing reasons. He noted inconsistencies between his testimony and the medical evidence. I've talked briefly about the knee pain and how the medical evidence showed that his range of motion was good. He was relatively comfortable. The ALJ noted inconsistencies in his own statements. For example, his use of opiates. At one point stating that he used them at any opportunity he had through 2008, but others denying he used them at all after 2005. His testimony about the severity of his panic attacks. At some points he testified that they were daily and lasted up to 20 minutes. To medical providers he testified that he only experienced them twice a week and they were significantly improved with medication. Then he returned to the hearing and again stated that he had daily panic attacks. His claims of agoraphobia. He stated to medical providers that he was fearful of open spaces. He had explained his ability to leave his house and go to the soccer games as because they were in open spaces. The ALJ noted his testimony was inconsistent with his activities. He was able to perform yard work, mow the lawn, shop, attend the soccer games again. The ALJ noted evidence of secondary gain motivation. Gambling problems risen to the level of losing housing opportunities, yet Mr. Barr continued attending casinos multiple times a month throughout the period of disability. The ALJ noted drug-seeking behavior as characterized by his medical providers. A lack of candor in some areas carries over into subjective testimony. The ALJ's credibility finding was sufficiently specific to show that Mr. Barr was not credible as to his limitations. If this Court has no further questions. Thank you. Well, Dr. Sampson saw claimant every six weeks or so throughout 2010 and 2011. He didn't just check his medications, although he gave him very strong medications. He also examined him and interviewed him. Dr. Sampson said nothing about phoniness. He found anxiety, depression, panic disorder, social phobia every single time. The medications weren't fully effective. Over time, they were not fully effective. So if he's not relying on the claimant's own subjective statements, then how could he be meeting him so frequently? An MD seeing somebody every six weeks or so is not going to be hornswoggled by incredible statements. The credibility comes from the doctors themselves. Dr. Trowbridge specifically tested for malingering using the Ray test two times. No malingering. Dr. Van Dam raised a question about malingering, but never diagnosed it. She was left with questions and a probable personality disorder. The general credibility questions don't touch these physicians. Dr. Sampson's medical history, his interviewing, and his record review of Dr. Sampson at BHR were all questionable. He may not be generally credible, but his doctors found him to be specifically credible for what they saw. If they're basing it on their own clinical views and their record reviews and their perception of him in firsthand observations, they're the ones who establish the requisite credibility, not the general statements about what he's like as a sort of a character. At least one of the things ALJ pointed out, though, the soccer games kind of bothered me. Here he is trying to go once in a while with the child of the soccer games, and he finds he can because he can stay away from the people. Well, that's fine. That's consistent with the social phobia and the anxiety. Also, on the skin condition, the ALJ is an inquisitor, and often you've seen ALJs say, well, I eyeballed the guy at the hearing, and that's one of the factors I used to discredit him. Here the ALJ refused. He refused when the plaintiff tried to show, the claimant tried to show him his hands. So the ALJ was on notice that there was something going on with the hands, and the claimant said, I can't always close my hands. That would affect handling, which would affect the sedentary work range. It would eliminate it, probably. Other than that, the Appeals Council incorporated the evidence. They are under a regulatory obligation to send it back if it does not relate to the ALJ's decision period. They incorporated it. They considered it. They said nothing. They made it part of the record. It relates to the very good issue. When you say it, what are you referring to? The evidence that was presented to the Appeals Council. But that was mainly that dermatology evidence? It was, and it did show worsening. On September 19, 2011, significant hyperkeratosis, multiple deep fissures, erythema affecting palms and bottoms of the feet. At that point, it's worsening. The claimant alleged it in May at the hearing. It was apparent before the ALJ rendered a decision. It would affect this unique sub-sedentary RFC because of the handling limitations. Anyway, that's part of the record, too. Thank you. Thank you very much. Thank you both for your arguments today. This case is now submitted.
judges: ALARCON, TASHIMA, MURGUIA